Filed 2/5/21  P. v. Brooks CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROWAN CROSBY BROOKS, JR.,<br><br>    Defendant and Appellant. | F079794<br><br>(Super. Ct. No. BF111490A)<br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from an order of the Superior Court of Kern County.  Michael G. Bush, Judge.

James S. Thomson, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Poochigian, Acting P.J., Franson, J. and Peña, J.

Appointed counsel for defendant Rowan Crosby Brooks, Jr., asked this court to review the record to determine whether there are any arguable issues on appeal. (*People v. Wende* (1979) 25 Cal.3d 436.) Defendant was advised of his right to file a supplemental brief within 30 days of the date of filing of the opening brief. Defendant responded, contending (1) the trial court erred in denying his Penal Code section 1170.95[1] petition for resentencing, (2) he had the right to be present at the hearing on the petition, (3) he had the right to present evidence at the hearing, and (4) section 1170.95 is void for vagueness on its face. Finding no arguable error that would result in a disposition more favorable to defendant, we affirm.

## PROCEDURAL SUMMARY

On December 1, 2005, the Kern County District Attorney filed an information charging defendant with first degree murder as follows:

> "On or about August 16, 2004, [defendant] did willfully, unlawfully, deliberately, and with premeditation and malice aforethought murder Stella Fox, a human being, in violation of … section 187, a felony."[2] (Unnecessary capitalization omitted.)

On April 4, 2006, a jury found defendant guilty as charged.

On August 8, 2006, the trial court sentenced him to 25 years to life in prison.

More than 12 years later, on January 1, 2019, Senate Bill No. 1437 (Senate Bill 1437) (2017–2018 Reg. Sess.) went into effect. It amended sections 188 and 189 and narrowed the scope of culpability for murder. (See Stats. 2018, ch. 1015, §§ 1–3.)

On July 15, 2019, defendant filed a petition for resentencing pursuant to the newly enacted section 1170.95.

---

[1] All statutory references are to the Penal Code.

[2] "[A]ny … kind of willful, deliberate, and premeditated killing" is first degree murder. (§ 189.)

On July 19, 2019, the trial court summarily denied the petition. It appears that defendant was not present, but defense counsel was.[3] The following occurred:

> "THE COURT: Rowan Brooks, BF111490. This is a case—[the prosecutor] is here on behalf of the People. This case is where you filed [a section] 1170.95 [petition]. [Defense counsel] represented him at the trial. I was the trial judge. I specifically remember this case. I'm going to deny the petition. He's clearly if—if he was guilty of this, he was clearly the actual killer, he would not have been—he simply would not qualify under [section] 1170.95. There's no reason to withdraw the motion.
>
> "[Prosecutor], any objection?
>
> "[PROSECUTOR]: No.
>
> "THE COURT: All right. I'm going to deny the petition. He's not eligible."

On August 14, 2019, defendant filed a notice of appeal.

## FACTS

The following facts are taken from our prior opinion, *People v. Brooks* (July 29, 2008, F051251) [nonpub. opn.]:[4]

> "Defendant married Fern on December 31, 1986. In the beginning they had a good marriage that included an intimate sexual relationship. Over the years, Fern experienced depression and their sexual intimacy ceased. Beginning in 2004, they slept in separate beds. Defendant was a social worker and Fern helped him in his office. Fern died on August 16, 2004.
>
> "Defendant's daughter from a prior marriage, Jinee Brooks, testified at trial. She is a registered nurse. Defendant was at a holiday party at Jinee's home in December of 2003. Fern was also there, but she was sitting in another room reading. Defendant asked Jinee and her nursing friends how they would kill someone if they were going to do it. Jinee said she

---

[3]    The minute order states first that defendant appeared with defense counsel, then states defendant was not present.

[4]    Defendant's motion that we take judicial notice of the record and our prior opinion in *People v. Brooks*, *supra*, F051251 is granted.

3

would use potassium or succynicholine [*sic*].  Defendant asked why she chose those two chemicals and how one would obtain the chemicals.  Jinee explained that she, as a nurse, could not obtain potassium.  Defendant said that he could obtain it.  Defendant then asked about giving nicotine to someone to kill them.  Jinee explained that it would be difficult to kill someone with nicotine and the nicotine could be traced.

"Debbie Coleman had known defendant for several years.  She was a social worker for child protective services.  She had met defendant when she was one of his clients in his counseling practice.  Later she asked him to teach her cognitive therapy.  They became friends and in March of 2004 began a sexual relationship.  They had sex every day at his office or her apartment.

"Defendant told Coleman he was going to ask Fern for a divorce.  He showed Coleman the divorce papers he had typed up.  Although defendant and Coleman had not discussed marriage prior to Fern's death, they had determined that after the divorce they would see where their relationship as a couple would lead.  Defendant told Coleman he asked Fern for a divorce but she did not want a divorce.  Coleman expressed to defendant her desire to spend more time together.  Defendant and Coleman had sexual relations at his office on August 14, 2004.

"Bobby Scrivner is Fern's daughter from a prior marriage.  She testified that she was close to her mother.  She had problems with Fern marrying defendant and she did not like him.  She saw her mother frequently even though she did not want to associate with defendant.  Over the course of time, she became more accepting of defendant because her mother was content.

"On the evening of August 14, 2004, Fern and defendant went out to dinner with Bobby and her husband Stan to celebrate Stan's birthday.  Fern was subdued at dinner and said she did not feel well.  Fern normally finished her dinner but she was unable to do so on this evening.  Conversation at the dinner table was forced, which was unusual.  Fern and Bobby had previously discussed that defendant and Fern might go to Las Vegas for Christmas that year.  During dinner Bobby asked Fern about the progress of the Las Vegas plans.  Fern looked at defendant in a 'funny' way and put her head down.  She said she did not think they were going to be able to do that this year.  Fern never told Bobby anything about a divorce.  When they left the restaurant, Fern kissed Bobby and told her she loved her.  Bobby was shocked because they did not usually openly express their affection toward one another.  This was the last time Bobby saw her mother alive.

4

"At approximately 3 a.m. on August 16, 2004, paramedics were called to defendant's home. Defendant opened the door and directed paramedic Adam Steele to the bedroom. Defendant said that Fern did not want cardio pulmonary resuscitation (CPR) performed; Steele asked defendant for the proper paperwork. Defendant was very calm and collected. Steele determined that no lifesaving procedures would be attempted because Fern was clearly dead.

"Fire Captain Jeff McEntire testified that Fern had been dead at least a couple of hours. Defendant told McEntire that it had been several hours since he talked to Fern and he had been up watching the Olympics on television. Defendant continued to watch the Olympics, and offered coffee to the personnel in his home. McEntire remembered this call quite well because of this and because defendant did not seem to be bothered by his wife's death.

"Police officer Christopher Johnson was called to the scene to investigate the death. He asked defendant what had happened. Defendant told him he got up at 2:45 to use the restroom. He checked on Fern and found her dead in her bed, face down. Defendant told Johnson that Fern had been feeling ill the evening before but she was not suicidal. Johnson saw marks on the left side of Fern's neck but he did not think they were assaultive wounds. He asked defendant about the marks and defendant said that Fern had fallen several times. Defendant asked Johnson several times if the mortuary could come out and told Johnson that Fern wanted to be cremated. Defendant questioned why Johnson was taking pictures and why he had called the coroner's office. Defendant's demeanor was strange, but Johnson recognized that everyone reacts differently to these types of situations.

"Fern's body was transported to the coroner's office and put into refrigeration. Defendant called Bobby at approximately 6 a.m. and told her Fern had died 'apparently of a heart attack.' Bobby went to defendant's, arriving at approximately 7:15 with her daughter and husband Stan. Bobby asked what had happened. Defendant said that Fern was having chest pains and not feeling well all day on August 15. He offered to take her to the emergency room but she would not go. She tried to get up and fell and hit the dresser. Defendant said that is why Fern had marks on her neck.

"Defendant was not crying or emotional. Fern's will and living will were on the counter; Fern had executed do-not-resuscitate orders. Defendant remarked that he wondered if they would have to go to court. Defendant said he had a dental appointment and an appointment at the Social Security office. Bobby felt that defendant did not want her there.

5

She left with her husband and daughter. Before leaving, Bobby told defendant she wanted to see her mother before she was cremated. Defendant said he would make the arrangements. Coleman called defendant before 8 a.m. He told Coleman that Fern had died and Bobby was currently at his apartment.

"Defendant called the owner of the funeral home and arranged to meet him at the funeral home. Defendant met the owner at 8:30 a.m. Defendant kept his appointment for his routine teeth cleaning. He told the dental assistant that his wife had died that morning, yet his demeanor was ordinary.

"Dr. Thomas Volk began the autopsy of Fern at approximately 1:25 p.m. on August 16, 2004. Dr. Volk had finished with Fern's external examination and began his internal examination by investigating her head. He noted injury to her head and stopped the autopsy. His assistant contacted her supervisor and the police department was called to participate in the autopsy.

"After police personnel arrived, Dr. Volk continued the autopsy. Pictures and various samples were taken during the autopsy. Dr. Volk listed cardiac arrhythmia of minutes' duration due to aspiration of vomitus as the primary cause of death. He listed blunt force injuries at the hands of another as a contributing factor. Dr. Volk did not testify at trial.

"In the late afternoon of August 16, 2004, after the autopsy was completed, defendant agreed to come to the police station for an interview. After the officers had asked defendant some questions, he was asked if he would agree to let them take scrapings from his fingernails. Defendant agreed to let them take scrapings. When the officers left the room, defendant began methodically cleaning under each fingernail with his mouth. Defendant was not aware that there was a video camera in the room.

"Coleman went to defendant's apartment the evening of August 16, 2004, unaware that he was at the police station. Officers were at the apartment conducting a search. An officer asked her what her relationship was with Coleman and she said they were just friends. She was interviewed at the police station on August 23, 2004, and at that time told the police that she had been having an affair with defendant.

"After the interview, defendant was arrested but released the next morning. Coleman picked him up from jail. Defendant called Bobby on August 18, 2004, and said he needed to meet her and Stan at the bank. He

6

said they needed to set matters up so that Bobby could take care of finances concerning Fern because he expected to be rearrested. Bobby had previously called the banks on August 17, 2004, after she learned of defendant's arrest and had them freeze all of Fern's bank accounts. Bobby told defendant that she thought freezing of accounts was a routine thing. Defendant was unable to remove any money from Fern's accounts at this time. Defendant gave Bobby some of Fern's personal belongings. Included in the box of belongings were journals written by Fern. The journals from 2003 and 2004 were not among the belongings.

"Defendant and Coleman went out of town together on August 20, 2004. They went away together again the next weekend. They began living together in November of 2004 and were married on July 10, 2005. Defendant was not rearrested until August 25, 2005.

"Defendant consulted an attorney in February of 2005 regarding Fern's estate. Also in February defendant went to the credit union and closed several accounts. He received $49,937.40.

"During the search of defendant's apartment, officers removed a computer. On November 16, 2004, Detective Allan Abney conducted a forensic evidence search on the computer. He found evidence of several searches conducted on the computer that were of interest. The following searches were conducted: (1) 'murder' (May 29, 2004), (2) 'killing humans' (June 18, 2004), (3) 'respiratory arrest' (July 2, 2004), (4) 'Nicotine acid purchase' (July 9, 2004), (5) 'chemicals that cause heart attacks' (July 23, 2004), (6) 'causes of instant heart attack' (July 23, 2004), (7) 'lethal dose levels' (July 25, 2004), and (8) 'lethal doses of chemicals' (Aug. 14, 2004). In addition, defendant accessed a chapter from a textbook titled 'Fast Poisoning.' Detective Abney was not able to determine if the site results from the search were accessed, although on most of the searches more than one result page was viewed.

"Dr. Glen Wagner, the chief medical examiner for San Diego County, was contacted by Detective Charles Church and asked to review the coroner's report, as well as the photographs, toxicology reports, and histological slides of tissues collected during the autopsy. Because Fern was cremated after the autopsy, Dr. Wagner was not able to examine her body.

"Dr. Wagner began with the photographs showing the external injuries to Fern's body. He described bruising to Fern's left eye and discoloration below the left eye and on the left forehead. In addition, she had an area of discoloration over her right forehead. She had bruising of

7

her lips, particularly the lower lip on the left side. She had a bite mark to the front of her tongue and multiple and extensive injuries to her tongue in association with teeth as the objects causing the bruising. Fern had a series of bruises over her right shoulder and bruises and scrapes over her left shoulder. There was shadowing on the left jaw line, with additional bruising below the collarbone to the left upper chest. Fern had discoloration on her left hand and a laceration involving her thumb and three fingers. She had a large number of abrasions that had a curvilinear appearance over her left shoulder and neck, extending backward to the mid portion of her neck. The abrasions were patterned and appeared to be fingernail scrapes. She had some injuries to the right side of her neck and also had an ear bruise that extended towards her cheek.

"Dr. Wagner then testified about internal injuries photographed during the autopsy. He said that one photograph showed gastric contents in the area of the voice box and larynx, but the amount was not extensive. Dr. Wagner saw discoloration on both sides of the airway, in the voice box and larynx. The hyoid bone, which sits directly above the larynx, was intact. This bone is very sensitive to any kind of pressure and is oftentimes fractured in cases of neck compression. Although Dr. Volk described no injuries to the hyoid and photographed no injuries in this area, Dr. Wagner saw injuries to the larynx in the photograph and interpreted them as having arisen from compression of this portion of the airway. Dr. Wagner saw bruising on the muscle of the scalp immediately above the right ear. There was bruising to the back right side of the brain, a common injury in falls.

"Dr. Wagner testified that Fern's heart showed no gross evidence of disease, defect, or trauma and there was no evidence of a heart attack or heart injury. Dr. Volk found nothing wrong with the heart.

"Dr. Wagner testified that Dr. Volk did a good job performing the autopsy, but Dr. Wagner's opinion differed from that of Dr. Volk. Dr. Wagner differed from Dr. Volk on the importance of vomitus in the airway. Dr. Wagner found the amount of vomit to be small. The vomit was not in the lungs, and it did not appear the vomit caused any blockage.

"Dr. Wagner relied on hemorrhages in the brain and eye (petechiae in the eye). Dr. Wagner testified that petechiae anywhere, but particularly in the face and especially in the eyes, are a function of change in pressure. Petechiae are caused when pressure is put on the blood vessels and the capillaries (the very smallest vessels) rupture and cause pinpoint hemorrhages (petechiae). He testified '[i]n the case of an eye, and in the case of perivascular hemorrhages in the brain with evidence of trauma in the neck, there is a strong indication of an asphyxial component to this

8

injury, whether it's a ligature or hanging or a choking of some fashion. But you have to cause a change in vascular pressures in order to cause those blood vessels to hemorrhage and break or bleed.' These changes would not be caused by a heart attack. Dr. Wagner testified that the eye petechiae were not evident in the autopsy photographs but were present in Dr. Volk's microscopic slides and in Dr. Volk's report.

"It was Dr. Wagner's opinion that the blunt force injuries were inconsistent with simple falls; the injuries were more consistent with a prolonged period of blunt force injuries. Based on the character, location, and pattern of the injuries, he found that they were more consistent with slaps, punches, and neck compression. He found the combination of bruises and abrasions on the left side of the neck and the contusions on the right side of the neck represented pressure being applied. It was, however, unusual that the hyoid bone was not fractured, but the thyroid cartilage right below the hyoid bone was fractured.

"The semicurved injuries to the back of the neck and shoulders contained a number of semicircles that overlapped. The character of those injuries was most consistent with fingernail scratches. The overlapping injuries indicated the person causing the injuries was repositioning his or her hands. Some of the scratch marks were from the victim trying to get a hand away from the neck or head.

"Dr Wagner believed that the primary cause of death was 'asphyxiation because of the injuries to the neck, that the blunt-force injuries to the head and face, although in and of themselves not fatal, speak to an assault and, therefore, an injury at the hands of another; and that there is no underlying natural disease that I can find in the autopsy or the slides that would be an alternative description.' The manner of death was a homicide.

"**Defense**

"Several witnesses testified that they had never seen defendant act violently.

"Defendant testified on his own behalf. He testified that he liked Fern but he wanted to be free from their marriage. He was having an affair with Debbie Coleman. He brought up the subject of divorce to Fern in August of 2004. She did not want a divorce and defendant agreed to wait, although he was not going to change his mind.

9

"On August 15, 2004, defendant pulled out the divorce papers he had typed up.  Fern suggested they share their living arrangements.  Defendant said no.  Fern was willing to go along with the divorce, although she was sad.

"Fern had lost consciousness on several occasions prior to August 15, 2004.  After Fern and defendant spoke about the divorce on August 15, 2004, Fern went into the kitchen to microwave some dinner.  She called out to him, as she had collapsed on the floor in the kitchen.  This was not unusual, except this time Fern was in pain.  Defendant helped Fern to her feet, putting his hands under her armpits.  He walked her into the bedroom.  Fern did not want to go to the emergency room.  Defendant got her a cold washcloth for her face and gave her a bucket because she felt sick.

"Fern got in bed.  Defendant watched the Olympics on television in the other room.  He checked on her every 10 or 15 minutes and took her to the bathroom several times while she attempted to throw up.

"At 11 p.m. Fern got up by herself; all of a sudden her legs collapsed.  Defendant tried to grab her by the shoulders but his hands slipped off.  Her head slipped towards the dresser and defendant's hands ended up around her neck.  He grabbed her to keep her from hitting her head on the dresser.  He got behind her and helped her up.  She sat on the bed and then he helped her to the bathroom.  She fell down again.  She went to the bathroom and then back to bed.  Defendant returned to watching the Olympics.  He returned to the bedroom and the same thing happened again; this time he caught her around the mouth.

"Defendant went to bed around midnight.  He asked Fern if she wanted to go to the emergency room and she firmly told him no.  Defendant got up about 3 a.m. to go to the bathroom.  It looked like Fern was not breathing.  He checked her and she was cold to the touch.  He called 911.

"He said he was not completely honest during his interview with police when he told them he did not know how Fern got injuries to her neck.  He explained that he was embarrassed that his hands had gotten around her neck.  Defendant had no explanation for why he cleaned out his fingernails with his teeth at the police station.

"Forensic pathologist Silvia Comparini studied the evidence from the autopsy. She interpreted the evidence much differently from Dr. Wagner.  It was her opinion that Dr. Volk was correct that the cause of

10

death was cardiac arrhythmia due to aspiration of vomitus.  She would have added that Fern suffered moderate to severe fat in her right ventricle.  The other injuries to Fern were consistent with having occurred from falls or being helped.

"The court admitted portions of a tape made during a session between Fern and Hans King, a channeler, on August 14, 2004.  During this session Fern and King discussed Fern and defendant's relationship.  Fern said she still wanted the relationship.  She said defendant told her he wanted a divorce.  She said that their relationship had been nonsexual for years.  She told King that a few weeks earlier defendant said he wanted to talk and said he wanted a divorce.  She said it was a surprise because defendant was her best friend.  She asked him if there was anything they could do about it or work on it, but he said he did not think so.  Defendant told her he was very unhappy and he did not love her anymore.  One evening, she asked defendant what if she said no to the divorce.  He looked at her 'funny' and did not answer.  She said she wanted better reasons for why he wanted a divorce.  Fern told King that her friendship relationship with defendant has always been perfect and beautiful.  King advised Fern to tell defendant that she would like to know his reasons for a divorce and to say to him that she loves and honors him so much that she will give him a divorce if that is what he really wants.  Fern told King that she asked defendant if they could share the house." (*People v. Brooks*, *supra*, F051251, at pp. 2–11.)

On appeal, defendant argued, among other things, the evidence was insufficient to support a finding of premeditation and deliberation because the manner of the killing suggested it was an impulsive killing.  We concluded the evidence was sufficient and we affirmed.

## DISCUSSION

### I.    Law

In 2018, the Legislature enacted Senate Bill 1437 after determining there was further "need for statutory changes to more equitably sentence offenders in accordance with their involvement in homicides."  (Stats. 2018, ch. 1015, § l, subd. (b).)  Senate Bill 1437 amended the definition of felony murder in section 189 and eliminated liability for murder under a natural and probable consequences theory.

11

Senate Bill 1437 changed murder liability under these theories through two statutory amendments.  First, "[u]nder the felony-murder rule as it existed prior to Senate Bill 1437, a defendant who intended to commit a specified felony could be convicted of murder for a killing during the felony, or attempted felony, without further examination of his or her mental state." (*People v. Lamoureux* (2019) 42 Cal.App.5th 241, 247–248.) Senate Bill 1437 amended section 189 to provide that a defendant who was not the actual killer and did not have an intent to kill is not liable for felony murder unless he or she "was a major participant in the underlying felony and acted with reckless indifference to human life …." (§ 189, subd. (e)(3).)  Under the new law, "[a] participant in the perpetration or attempted perpetration of a felony … in which a death occurs is liable for murder only if," he was the actual killer, "[t]he person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree," or "[t]he person was a major participant in the underlying felony and acted with reckless indifference to human life." (§ 189, subd. (e)(1)–(3); see *People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).)

Second, before Senate Bill 1437, "the natural and probable consequences doctrine rendered a defendant liable for murder if he or she aided and abetted the commission of a criminal act (a target offense), and a principal in the target offense committed murder (a nontarget offense) that, even if unintended, was a natural and probable consequence of the target offense." (*People v. Lamoureux*, *supra*, 42 Cal.App.5th at p. 248.)  "[T]o amend the natural and probable consequences doctrine, Senate Bill 1437 added section 188, subdivision (a)(3) … :  'Except [for felony-murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime.' " (*Gentile*, *supra*, 10 Cal.5th at pp. 842–843.)

Senate Bill 1437 also added section 1170.95 (see Stats. 2018, ch. 1015, § 4, eff. Jan. 1, 2019) to provide a postjudgment procedure by which a defendant "convicted of felony murder or murder under a natural and probable consequences theory" may petition the trial court to have the "murder conviction vacated and to be resentenced on any remaining counts." (§ 1170.95, subd. (a).)

Once a section 1170.95 petition is filed, there follows a multi-step process by which the trial court first determines whether the petition is facially complete, and, if so, whether the petitioner has made a prima facie showing that he falls within the provisions of statutory eligibility. (*People v. Torres* (2020) 46 Cal.App.5th 1168, 1177, review granted June 24, 2020, S262011.) "First, the person must file a petition with the trial court that sentenced the petitioner declaring, among other things, that the petitioner 'could not be convicted of first or second degree murder because of changes to Section 188 or 189.' (§ 1170.95, subd. (a)(3); see § 1170.95, subd. (b)(1)(A).) Then, the trial court must 'review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of th[e] section.' (§ 1170.95, subd. (c).)" (*Gentile*, *supra*, 10 Cal.5th at p. 853.) To do so, the court must determine whether "(1) [a] complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[,] [¶] (2) [t]he petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[, and] [¶] (3) [t]he petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a); *id*., subd. (c).) If the court determines at this first stage the petitioner is ineligible for relief as a matter of law, the petition is denied; if not, the court proceeds to the next step. (*Torres*, at p. 1178.) Then, "the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction and to

13

resentence the petitioner on any remaining counts. (§ 1170.95, subds. (c), (d)(1).) At the hearing, the prosecution must 'prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' (§ 1170.95, subd. (d)(3).) 'The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' " (*Gentile*, *supra*, 10 Cal.5th at p. 853.)

## II.    Analysis

In this case, the information filed against defendant in 2005, in which he was the sole defendant, alleged that he "willfully, unlawfully, deliberately, and with premeditation and malice aforethought murder[ed] Stella Fox, a human being." (Unnecessary capitalization omitted.) We also note that the only homicide theory the jury was instructed on was first degree murder—that to find first degree murder they must determine defendant willfully intended to kill, carefully weighed the considerations for his choice, and, knowing the consequences, decided to kill; and that to find that defendant acted with premeditation they must find he decided to kill before committing the act that caused death. They were instructed that all other murders are murders of the second degree. The jury was not instructed on felony murder or the natural and probable consequences doctrine as it relates to aiding and abetting liability for murder. (*People v. Brooks*, *supra*, F051251, pp. 47–48.) The jury found defendant guilty of first degree murder, and the trial court imposed 25 years to life in prison.

In 2019, defendant filed, in propria persona, a section 1170.95 petition for resentencing alleging that (1) the information filed against him in 2005 allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; (2) at trial, he was convicted of first or second degree murder pursuant to the felony-murder rule or the natural and probable consequences doctrine; (3) he could not now be convicted of first or second degree murder because of changes made to sections 188 and 189 pursuant to Senate Bill 1437; (4) he was not the actual killer; (5) he did not, with the intent to kill, aid, abet, counsel, command, induce,

14

solicit, request, or assist the actual killer in the commission of murder in the first degree; (6) he was not a major participant in the felony or he did not act with reckless indifference to human life during the course of the crime or felony; (7) the victim of the murder was not a peace officer; and (8) defendant was requesting appointed counsel.

Defendant's allegations, made under penalty of perjury, were virtually all false. He was charged with and convicted of *first* degree murder, he was the *only* participant and the *actual* killer, and he would still be convicted of first degree murder under current law. Section 1170.95 does not offer relief to actual killers, and thus section 1170.95 does not apply to defendant as a matter of law. The trial court properly denied his petition.

Assuming defendant was entitled to be present at the hearing, we conclude any error was harmless beyond a reasonable doubt. As a purely legal matter, he was not entitled to relief under section 1170.95, and his presence would not have made any difference. Therefore, any error was harmless.

As for the right to present evidence, defendant had not reached that step in the procedure of bringing a section 1170.95 petition. Had his petition made a prima facie showing that he falls within the provisions of statutory eligibility, the petition would have proceeded to the next step. The right to present evidence in support of the resentencing petition arises only when the court issues an order to show cause. (§ 1170.95, subd. (d)(1), (3).) That did not occur here.

Lastly, defendant complains section 1170.95 is void for vagueness, apparently because it does not apply to everyone. " '[A] claim that a law is unconstitutionally vague can succeed *only* where the litigant demonstrates, not that it affects a substantial number of others, but that the law is vague as to [him] or "impermissibly vague in *all of its applications*." ' " (*People ex rel. Brown v. iMergent, Inc*. (2009) 170 Cal.App.4th 333, 340.) Here, defendant fails to establish how the law is vague as to him. Furthermore, the law was not applied to defendant because the trial court denied his petition, and thus he is not aggrieved by any alleged vagueness of section 1170.95.

15

In sum, we have reviewed the record and find no arguable issues on appeal.

## **DISPOSITION**

Defendant's motion that we take judicial notice of the record and our prior opinion in case No. F051251 is granted. The order denying defendant's section 1170.95 petition for resentencing is affirmed.